## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID EDWARD GORNEY,** | : | **Civil No. 1:20-cv-2411** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security[1],** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

David Gorney was 27 years old when he applied for Social Security benefits alleging that he was totally disabled from performing any work. (Tr. 32, 207-12). While Gorney was an active online gamer, he had no past relevant work history. (Tr. 32). According to Gorney's treatment records, at the time that this disability application was pending, Gorney shared with his caregivers that his "future plan is SSI and building his online life, potential career, he was quite clear about this direction." (Tr. 581). Further, Gorney "hesitated" when his treatment provider said

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g) Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

1

that they should "discuss ability more than disability, life beyond online gaming and communities." (Id.)

In Gorney's case, the ALJ was presented with a claimant who had an extensive medical history and multiple severe impairments. However, the degree to which these impairments were totally disabling was the subject of significant dispute among medical sources, with Gorney's treating physician opining that he could not even engage in a limited range of sedentary work while every other medical source opined that Gorney had far greater work capabilities. Ultimately, considering all of this evidence, the ALJ fashioned a very restrictive sedentary work RFC for Gorney, but found that he could still perform this limited range of work and denied his disability application.

Gorney now appeals this decision, arguing that the ALJ erred in rejecting the treating source opinion and in fashioning an RFC which was not explicitly grounded upon a specific medical opinion. In considering this disability determination we are enjoined to apply a deferential standard of review to Social Security appeals, one which simply calls for a determination of whether substantial evidence supported the ALJ's decision. Mindful of the fact that, in this context, substantial evidence is a term of art which "means only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek v. Berryhill, 139 S. Ct.

1148, 1154 (2019), we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.   <u>Statement of Facts and of the Case</u>

On November 7, 2016, David Gorney applied for supplemental security benefits, alleging that he had become disabled beginning on April 1, 2012. (Tr. 15). Gorney was born in 1989 and was 27 years of age at the time that he submitted this disability application. (Tr. 32). He was a high school graduate and had attended three years of college, having reportedly gone to college in order to get into online gaming. (Tr. 97). However, Gorney had not completed his degree work due to his impairments. (<u>Id.</u>) Gorney had no prior employment history and had never performed any significant past relevant work at the time that he applied  for Social Security benefits. (Tr. 32, 212-213).

### A. <u>Gorney's Clinical History</u>

Gorney's presenting medical concerns and impairments included morbid obesity, peripheral neuropathy, diabetes, venous insufficiency, degenerative disc disease, and depression. With respect to these medical conditions, the clinical record confirmed that Gorney suffered from these ailments, but was somewhat more equivocal regarding whether the conditions were totally disabling in their severity.

3

Thus, it was apparent that Gorney, who was five feet six or seven inches tall, and weighed between 350 and 380 pounds, was morbidly obese. (Tr. 221, 304). Gorney's caregivers ascribed this obesity to his sedentary lifestyle and excess caloric intake and recommended diet changes and increased exercise. (Tr. 302, 304). Gorney's clinical treatment record from 2016 through 2019, however, presented a mixed picture regarding the severity and disabling effects of his medical impairments.

For example, in 2016, it appears that Gorney had more than a dozen treatment appointments with his family practice, mental health providers, and neurologists.[2] During these examinations Gorney's weight fluctuated between 376 and 380 pounds. (Tr. 302, 305, 332, 338, 341). Despite his morbid obesity, treatment notes from 2016 provided differing accounts of the degree to which Gorney was physically impaired. At various times his gait was described as normal or stable and it was indicated that he walked without a cane. (Tr. 304, 305, 352). On other occasions he was described as walking with a "waddling" gait (Tr. 315, 332, 336), and it was said that he used a cane to ambulate. (Tr. 336). However, the cane usage was characterized as limited or minimal and on at least one occasion it was reported that

---

[2] Tr. 302, 305, 309, 310, 312, 316, 317, 319, 328, 334, 338, 345, 349.

Gorney almost left his home without his cane because of the improvement in his condition. (Tr. 310, 316, 319).

These 2016 treatment records further documented Gorney's complaints of decreased range of motion, (Tr. 302), but also consistently reported bilateral muscle strength of 4+ to 5 and described his grip strength as normal. (Tr. 304, 336, 345, 350, 353). Moreover, test results from 2016 did not identify objective evidence of disabling impairments. For example, a May 11, 2016 x-ray of Gorney's left wrist and ankle yielded largely unremarkable findings, (Tr. 339), and a February 2016 MRI revealed no intracranial abnormalities. (Tr. 927).

Likewise, Gorney's mental health treatment records from 2016 disclosed that his judgment, insight and cognition were grossly intact, and that he was fully oriented. (Tr. 305, 309, 310, 316, 317, 319). These treatment records observed, however, that Gorney lacked motivation, tended to focus on barriers, engaged in excessive online gaming activities, and was not invested in the idea of spending less time online. (Tr. 305-06, 311). Gorney reported spending five to eight hours each day at the computer watching videos. (Tr. 349). Moreover, a recurring theme in Gorney's discussions with his care givers was his interest in securing disability benefits. (Tr. 306, 320, 334).

Gorney's clinical treatment records in 2017 painted a similarly equivocal picture regarding the extent to which his medical conditions were wholly disabling. In 2017 Gorney was examined and treated by mental health professionals, his family practice, pain clinic specialists,  and neurologists on more than fifteen occasions.[3] These treatment notes continued to document Gorney's overall lack of motivation and interest in securing disability benefits. For example, on January 24, 2017, during a treatment session, Gorney explained that his "future plan is SSI and building his online life, potential career, he was quite clear about this direction." (Tr. 581). Further, Gorney "hesitated" when his treatment provider suggested that they should "discuss ability more than disability, life beyond online gaming and communities." (Id.)

Gorney's 2017 treatment history documented his on-going obesity, with Gorney's weight fluctuating between 376 and 382 pounds. (Tr. 530, 536, 540, 547, 555, 565, 576, 579). Physically it was reported that he had good bilateral strength rated at 4+ to 5. (Tr. 531, 536, 552, 555, 565-66, 568). As for Gorney's gait, at various times it was described as stable and normal. (Tr. 531, 555). During a number of clinical encounters, medical staff observed that Gorney was walking adequately without a cane, (Tr. 582), and had "no difficulty with gait or balance." (Tr. 540, 546,

---

[3] Tr. 521, 529, 536, 538, 546, 550, 553, 555, 565, 568, 571, 576, 578, 580, 582.

550). However, in other instances staff stated that Gorney used a cane to ambulate and displayed an antalgic gait. (Tr. 555-565, 571, 573). Once again, Gorney's test results yielded little evidence of disabling impairments. Thus, an August 18, 2017 evaluation of a left wrist x-ray was unremarkable beyond documenting what appeared to be an old wrist injury. (Tr. 553). Furthermore, neurological studies conducted in May of 2017 revealed only a mild neuropathy. (Tr. 569).

During some seven treatment appointment in 2018,[4] Gorney's weight varied between 370 and 381 pounds. (Tr. 641,654, 674-75, 705, 787, 802, 819). Gorney consistently complained to his caregivers about pain which impaired his ambulation and movement, (Tr. 674-75, 783, 798), but  he had good hand grip strength which was rated 5/5 bilaterally. (Tr. 657, 820). Gorney's treating sources described his gait at various times in 2018 as "normal," "waddling,"  and steady or waddling with the assistance of a cane. (Tr. 642, 675, 787, 802). Further, a neurologist review of Gorney's EMG testing disclosed only very mild polyneuropathy. (Tr. 660).

Finally, Gorney's treatment records from 2019 documented a modest weight loss on his part, with Gorney's weight fluctuating between 349 and 360 pounds. (Tr. 880, 900, 1014). According to Gorney's caregivers, he retained 5/5 bilateral strength, (Tr. 931), had a stable gait, (Tr. 930), but on occasion ambulated with a cane. (Tr.

---

[4] Tr. 638, 654, 672, 702, 783, 798, 819.

880, 901). In August of 2019, Gorney received Botox treatment for chronic migraines, (Tr. 982), and an MRI study of his lumbar spine revealed only mild to moderate degenerative disc disease. (Tr. 1012-1013).

### B. <u>The Medical Opinion Evidence</u>

Given this mixed and equivocal picture that emerged from Gorney's treatment history, medical professionals who examined this case reached contrasting conclusions regarding the degree to which Gorney's physical and emotional impairments were totally disabling, although the greater weight of the medical opinion evidence favored the view that Gorney could perform some work. Thus, when the state agency experts, Dr. Melissa Franks and Dr. Tarun Ray, evaluated Gorney's mental and physical impairments in February of 2017, they concluded that he experienced only moderate mental limitations and could perform work at a medium exertional level. (Tr. 115-125). Dr. Robert Sklaroff, an outside medical consultant who reviewed Gorney's medical records in February of 2019, had a somewhat more guarded assessment of Gorney's capabilities but concluded that he could perform a range of light work. (Tr. 854-863).

In stark contrast to these medical opinions, Dr. Francis Bobek, Gorney's primary care physician, submitted reports in May of 2018 which described Gorney as completely disabled both physically and emotionally and opined that he was

8

unable to perform even a limited range of sedentary work. (Tr. 626-637). Dr. Bobek did not reconcile this highly restrictive medical opinion with his own treatment records, which presented a much more mixed and equivocal picture regarding Gorney's abilities and impairments.

It was on this record that Gorney's disability application came to be heard by the ALJ.

### C.   The ALJ's Hearing and Decision

It is against the backdrop of this evidence that the ALJ conducted two hearings in Gorney's case on December 8, 2018 and October 16, 2019. (Tr. 39-49, 85-104). During these hearings the ALJ received testimony from Gorney and various vocational experts. Following these hearings, on November 20, 2019, the ALJ issued a decision denying this application for benefits. (Tr. 12-33). In that decision, the ALJ first concluded that Gorney had not engaged in substantial gainful activity since November 2016, his application date. (Tr. 17). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Gorney's depression, obesity, diabetes, neuropathy, venous insufficiency, and degenerative disc disease were severe impairments (Id.)

At Step 3, the ALJ determined that none of these impairments met or medically equaled the severity of one of the listed impairments. (Tr. 18-21). Between

9

Steps 3 and 4 the ALJ concluded that Gorney retained the following residual

functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant would require a sit/stand option, with each interval being a maximum of thirty minutes, but he would not be off task when transferring. He would require the use of a cane for ambulation. The claimant could occasionally balance, stoop, crouch, crawl, kneel, and climb, but never on ladders, ropes, or scaffolds. He should avoid pushing and pulling with the lower extremities, including for the operation of foot controls. The claimant could perform frequent fine and gross manipulation for fingering, feeling, handling, and grasping. He would be limited to frequent exposure to vibrations and hazards, including moving machinery and unprotected heights. He should have no exposure to excessive loud noise, but could be in office setting noise. The claimant could perform simple, routine tasks, but no complex tasks. He could have occasional interaction with coworkers, supervisors, and the public.

(Tr. 21).

In reaching this very restrictive RFC determination which confined Gorney to

a limited range of sedentary work, the ALJ detailed Gorney's treatment history at

length, noting the numerous instances in which clinical records reflected relatively

benign or unremarkable findings. (Tr. 21-28). The ALJ also evaluated the medical

opinion evidence in light of this clinical record. On this score, the ALJ's analysis

entailed a careful individualized evaluation of each opinion in light of the overall

medical record. At the outset, the ALJ examined the initial state agency expert

determinations, finding that:

> Dr. Ray, the State Agency physical examiner, opined that the claimant
> retains the capacity to perform a medium range of exertional work
> (Exhibit 1A/6-8). He further opined that the claimant could have
> unlimited balancing, and could perform all other postural maneuvers
> occasionally (Exhibit 1A/6-8). He also indicated that the claimant
> should avoid concentrated exposure to hazards (Exhibit 1A/6-8).
> Overall, the undersigned gives this opinion little weight, as it is not
> supported by or consistent with the overall evidence of record,
> including diagnostic test results for measurable findings on clinical
> examinations. This opinion is also not consistent with the findings from
> objective physical examinations, including the findings that the
> claimant generally retained full strength over his upper and lower
> extremities, had normal coordination, and walked with a normal gait at
> most appointments throughout the relevant period while using a cane,
> but had chronic stasis changes over his bilateral lower extremities with
> edema, had some decreased range of motion over his extremities, and
> had occasional decreased sensation over his lower extremities and
> hands, as described more detail above. The overall evidence of record
> supports a finding that the claimant would be limited to less than the
> full range of sedentary work, within the above parameters.

(Tr. 28).

The ALJ gave greater credence to the largely uncontested opinion of the state

agency psychologist, Dr. Franks who:

> [F]ound a mild limitation with understanding, remembering, or
> applying information, a moderate limitation with interacting 28 Case
> 1:20-cv-02411-MCC Document 16-2 Filed 07/09/21 Page 29 of 61
> David Edward Gorney (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) Page 15 of 19 See Next Page
> with others, a moderate limitation with concentration, persistence, or
> maintaining pace, and a mild limitation with adapting or managing
> oneself (Exhibit 1A/4). She opined that the claimant would have a

moderate limitation with his ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods (Exhibit 1A/8-10). She further opined that the claimant would have a moderate limitation with his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Exhibit 1A/8-10). The undersigned gives this opinion great weight, as it is supported by and consistent with the claimant's history of mental health treatment, as well as his consistent complaints of pain and medication side effects. This opinion is also consistent with the findings from objective mental status examinations, including the findings that the claimant occasionally had a depressed mood, was sometimes tearful, and complained of irritability and difficulty interacting with his parents, but otherwise had a normal memory and attention, was alert and oriented, and had intact reality testing and insight, as noted above. The overall record, including mental health treatment notes in the claimant's testimony at the hearing, supports a finding that he would be limited to performing simple, routine tasks with occasional interaction with others, as noted above.

(Tr. 28-29).

The ALJ also gave partial weight to the most recent medical opinion of record

in this case, Dr. Skarloff's February 2019 opinion, explaining that:

Subsequent to the hearing in this matter, at the request of the undersigned Administrative Law Judge, Dr. Robert Sklaroff completed interrogatories on February 15, 2019 (Exhibit 10F). After careful review of the documentary medical evidence of record, Dr. Sklaroff indicated that the claimant's impairments do not meet or equal any listing (Exhibit 10F/9). He opined that the claimant could lift and carry twenty pounds continuously and fifty pounds occasionally (Exhibit 10F/2). He further opined that the claimant could sit for three hours,

stand for three hours, and walk for three hours at one time, and could sit for six total hours, stand for six total hours, and walk for six total hours in an eight-hour workday (Exhibit 10F/3). He did not note any limitations on the claimant's use of his hands or feet for activities (Exhibit 10F/4). He noted that the claimant should never climb ladders or scaffolds, but could perform all other postural maneuvers continuously (Exhibit 10F/5). He also indicated that the claimant should have no exposure to unprotected heights, and would be limited to moderate, office type of noise levels (Exhibit 10F/6). The undersigned gives this opinion partial weight. The undersigned agrees with this opinion to the extent it reflects that the claimant would be capable of performing less than the full range of sedentary work within the above parameters. This portion of Dr. Sklaroff's opinion is supported by and consistent with the evidence of record, including the findings that the claimant generally retained full strength over his upper and lower extremities, had no ataxia on coordination testing, and generally walked with a normal gait while using a cane at most appointments. However, the opinion that the claimant could perform work above this level is given little weight, as this portion of his opinion is not consistent with the findings that the claimant had observed edema over his bilateral lower extremities, had some decreased sensation over his feet and hands, and had limited range of motion due to obesity, as noted above.

(Tr. 31).

Having found this medical consensus to be persuasive, to the extent that it supported a finding that Gorney could perform some work, albeit a limited range of sedentary work, the ALJ considered, but discounted, the opinion of Dr. Bobek, which suggested that Gorney was incapable of any work activity whatsoever. The ALJ articulated her rationale for this determination at length in this decision, explaining that:

Dr. Bobek opined that the claimant could stand and walk for one hour at one time, and for one total hour in an eight-hour workday (Exhibit 3F/1). He indicated that the claimant could sit for eight hours at one time, and for eight total hours in an eight-hour workday (Exhibit 3F/1). He further opined that the claimant cannot perform any driving (Exhibit 3F/2). He noted that the claimant could lift and carry fifty pounds occasionally and ten pounds frequently (Exhibit 3F/2). He noted that the claimant could not use his feet for repetitive movements, such as operating foot controls and pedals (Exhibit 3F/2). Dr. Bobek opined that the claimant could not perform any postural maneuvers (Exhibit 3F/3). He noted that the claimant could only perform occasional simple grasping, medium dexterity, and feeling with his bilateral hands, but could not perform any power grip, fine manipulation, or forearm rotation (Exhibit 3F/3). He indicated that the claimant could occasionally reach, push and pull, and have by manual dexterity with both upper extremities (Exhibit 3F/4). He also noted that the claimant could use his hands, arms, and shoulders, to push, pull, carry, and lift up to ten pounds occasionally (Exhibit 3F/4). Overall, he noted that the claimant would be limited to less than sedentary work, and could not perform work on either a full-time or part-time basis (Exhibit 3F/5). The undersigned gives this opinion little weight. First, the issue of disability is reserved to the Commissioner. In addition, this opinion is not supported by or consistent with the overall evidence of record, including diagnostic test results for measurable findings on clinical examinations. This opinion is also not consistent with the findings from objective physical examinations, including the findings that the claimant generally retained full strength over his upper and lower extremities, had normal coordination, and walked with a normal gait at most appointments while using a cane, but had chronic stasis changes over his bilateral lower extremities with edema, had some decreased range of motion over his extremities, and had occasional decreased sensation over his lower extremities and hands, as described more detail above. In addition, the overall record, including Dr. Bobek's own examinations of the claimant, do not contain any serious, abnormal findings that would require such significant upper extremity limitations. The undersigned overall evidence of record supports a finding that the claimant would be limited to less than the full range of sedentary work, within the above parameters.

14

Dr. Bobek also opined that the claimant would have a moderate limitation with his ability to remember detailed instructions, exercise appropriate judgment, abide by occupational rules and regulations, make social adjustments, and maintain social functioning (Exhibit 4F). He indicated that the claimant would have a mild limitation with his ability to respond appropriately to supervisors (Exhibit 4F). He found marked limitations with the claimant's ability to function independently on a job, maintain continuous performance to complete a task, perform routine tasks on a sustained basis, properly complete sequential tasks, and perform at a consistent pace without an unreasonable number and length of rest periods (Exhibit 4F). He also found marked limitations with the claimant's ability to work in normal eight hour workday without psychologically based interruptions or distractions, work according to plantar schedule, use public transportation, be aware of normal hazards and make necessary adjustments, and to tolerate customary work pressures any work setting where production requirements and demands are placed on him (Exhibit 4F). Dr. Bobek indicated that the claimant would have an extreme limitation with his ability to complete a normal workday, concentrate and attend to a task over an eight-hour period, perform routine tasks on a regular basis, and perform routine tasks on a productive basis (Exhibit 4F). The undersigned gives this opinion little weight. First, the undersigned notes that Dr. Bobek is not a psychiatric physician. In addition, this opinion is not consistent with or supported by the claimant's history of mental health treatment, including the findings that he occasionally presented with a depressed mood, and complained of some irritability, but was otherwise alert and oriented, had a normal memory, had normal attention, was cooperative, and had intact reality testing and insight, as noted above. The overall evidence supports a finding that the claimant would be limited to simple, routine tasks with occasional interaction with others, but does not contain any serious, abnormal mental status findings that would support the significant degree of limitations noted by this source.

In September 2015, Dr. Bobek noted that the claimant should only sit for twenty minutes at one time (Exhibit 1F/75). The undersigned gives this opinion little weight. First, the undersigned notes that this

limitation was given following a lower extremity ultrasound, and there is no indication that it was expected or intended to last for twelve months or more. In addition, this opinion is not consistent with the overall evidence of record, including physical examination findings or the claimant's own testimony that he could sit for one and a half to two hours before needing to get up and stretch. However, in consideration of all the evidence, the undersigned finds that the claimant would require the option to switch positions between sitting and standing every thirty minutes, as noted above.

(Tr. 29-30).

Having reached these conclusions regarding the medical clinical and opinion evidence, the ALJ found that, even if he was restricted to a limited range of sedentary work, Gorney could perform jobs that existed in significant numbers in the national economy. (Tr. 32-33). Accordingly, the ALJ determined that Gorney had not met the demanding showing necessary to sustain this claim for benefits and denied this claim. (Tr. 33).

This appeal followed. (Doc. 1). On appeal, Gorney challenges the adequacy of the ALJ's decision, arguing the ALJ erred in the evaluation of the medical opinion evidence, particularly as it related to the treating source, Dr. Bobek, and further erred in crafting an RFC for the plaintiff that was not explicitly tied to a specific medical opinion. This appeal is fully briefed by the parties and is, therefore, ripe for resolution. As discussed in greater detail below, having considered the arguments of counsel, carefully reviewed the record, and remaining mindful of the deferential

16

standard of review which applies here, we conclude that the ALJ's decision is supported by substantial evidence, and thus we will affirm the decision of the Commissioner denying this claim.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [she] is not disabled is

supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision."

Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the

Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "Burnett does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim

made here, based upon alleged inadequacies in the articulation of a claimant's

mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the

United States Court of Appeals recently addressed the standards of articulation that

apply in this setting. In Hess, the court of appeals considered the question of whether

an RFC, which limited a claimant to simple tasks, adequately addressed moderate

limitations on concentration, persistence, and pace. In addressing the plaintiff's

argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC, the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

**B.**     <u>**Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed

impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." <u>Burnett</u>, 220 F.3d at 121 (citations omitted); <u>see also</u> 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); <u>Metzger v. Berryhill</u>, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and</u>

recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017)..

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F.Supp.2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4,

2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony

regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns, 312 F.3d 113; see also Rathbun, 2018 WL 1514383, at *6; Metzger, 2017 WL 1483328, at *5.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis

for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C.   Standard of Review: Analysis of Medical Opinion Evidence.

The Commissioner's regulations which were in effect at the time of these administrative proceedings also set standards for the evaluation of medical evidence, and define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to afford competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally were entitled to more weight. See 20 C.F.R. §404.1527(c)(2)("Generally, we give more weight to opinions from your treating

sources...”); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c).

In conducting this analysis the ALJ also must consider, and may follow, the opinions of non-treating sources like state agency experts or outside consultants. At the initial level of administrative review, state agency medical and psychological

consultants may act as adjudicators. See SSR 96-5p, 1996 WL 374183 at *4. As such, they do not express opinions; they make findings of fact that become part of the determination. Id. At the ALJ and Appeals Council levels of the administrative review process, however, findings by non-examining state agency medical and psychological consultants should be evaluated as medical opinion evidence. 20 C.F.R. § 404.1527(e) (effective Aug. 24, 2012, through Mar. 26, 2017). As such, ALJs must consider these opinions as expert opinion evidence by non-examining physicians and must address these opinions in their decisions. SSR 96-5p, 1996 WL 374183 at *6. Opinions by state agency consultants can be given weight "only insofar as they are supported by evidence in the case record." SSR 96-6p, 1996 WL 374180 at *2. In appropriate circumstances, opinions from non-examining state agency medical consultants may be entitled to greater weight than the opinions of treating or examining sources. Id. at *3. See Mack v. Berryhill, No. 3:16-CV-02260, 2018 WL 1123705, at *6 (M.D. Pa. Mar. 1, 2018).

Oftentimes, as in this case, an ALJ must evaluate medical opinions and records tendered by both treating and non-treating sources. Judicial review of this aspect of ALJ decision-making is guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ— not treating or examining physicians or State agency consultants—must make the

29

ultimate disability and RFC determinations." <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011). Thus, "[w]here ... the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" <u>Morales v. Apfel,</u> 225 F.3d 310, 317 (3d Cir. 2000) (quoting <u>Plummer</u>, 186 F.3d at 429). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, when evaluating a treating source opinion, an ALJ may not unilaterally reject that opinion, and substitute the judge's own lay judgment for that medical opinion. However, the ALJ may discount such an opinion when it conflicts with other objective tests or examination results. <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the treating source's medical opinion, and the doctor's actual treatment notes, justifies giving a treating source opinion little weight in a disability analysis. <u>Torres v. Barnhart</u>, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities

that were inconsistent with the opinion." Tilton v. Colvin, 184 F. Supp. 3d 135, 145

(M.D. Pa. 2016).

Finally, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F.Supp.2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

It is against these legal guideposts that we assess the ALJ's decision in the

instant case.

### D.     The Decision of the ALJ Will Be Affirmed.

In this setting, we are mindful that we are not free to substitute our

independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial

evidence, a quantum of proof which is less than a preponderance of the evidence but

more than a mere scintilla, Richardson v. Perales, 402 U.S. 389, 401 (1971), and

"does not mean a large or considerable amount of evidence," Pierce v. Underwood,

487 U.S. 552, 565 (1988), but rather "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). Judged against these deferential standards of review, we are constrained to find that substantial evidence supported the ALJ's decision that Gorney was not entirely disabled.

At the outset, we find that the ALJ did not err in concluding, based upon the greater weight of the medical evidence, that Gorney had the ability to perform some work. In this regard, Gorney faults the ALJ for crafting an RFC which was did not adopt Dr. Bobek's extreme limitations and was not directly based upon a specific medical opinion, suggesting that this RFC represented some sort of improper lay opinion by the ALJ.

We disagree. In our view this argument misconstrues the role of the ALJ and medical experts in the disability determination process. It is axiomatic that:

> The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations. See 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c). Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records, see, e.g., 20 C.F.R. § 404.1527(d)(1)-(2), "[t]he law is clear ... that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity," Brown v. Astrue, 649 F.3d 193, 197 n. 2 (3d Cir.2011). State agent opinions merit significant consideration as well. See SSR 96–6p ("Because State agency medical and psychological consultants ... are experts in the Social Security disability programs, ... 20 C.F.R. §§ 404.1527(f) and 416.927(f)

require [ALJs] ... to consider their findings of fact about the nature and severity of an individual's impairment(s)....").

Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011).

Thus, while a treating source's opinion is entitled to careful consideration by the ALJ, that opinion does not control the disability determination. Moreover:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F.Supp.2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden, 191 F. Supp. 3d at 455. Further, it is well-settled that: "'[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Therefore, we reject Gorney's "wooden view of the administrative adjudication process," which would require a specific medical opinion for each element of an RFC. Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *7 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub

nom. <u>Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017).

Here the ALJ's RFC determination met all of the requirements prescribed by law and was supported by substantial evidence; that is, "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Biestek</u>, 139 S. Ct. at 1154. At the outset, the ALJ's decision to give little weight to the treating source opinions of Dr. Bobek drew support from substantial evidence. As the ALJ aptly observed, with respect to Gorney's physical impairments

> [Dr. Bobek's] opinion is not supported by or consistent with the overall evidence of record, including diagnostic test results for measurable findings on clinical examinations. This opinion is also not consistent with the findings from objective physical examinations, including the findings that the claimant generally retained full strength over his upper and lower extremities, had normal coordination, and walked with a normal gait at most appointments while using a cane, but had chronic stasis changes over his bilateral lower extremities with edema, had some decreased range of motion over his extremities, and had occasional decreased sensation.

(Tr. 29). Likewise the ALJ found that the extreme restrictions imposed by Dr. Bobek relating to Gorney's emotional impairments were:

> [N]ot consistent with or supported by the claimant's history of mental health treatment, including the findings that he occasionally presented with a depressed mood, and complained of some irritability, but was otherwise alert and oriented, had a normal memory, had normal attention, was cooperative, and had intact reality testing and insight.

(Tr. 30).

Given that an ALJ may discount a treating source opinion when it conflicts with other objective tests or examination results, Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008), or when there are material discrepancies between the treating source's medical opinion and the doctor's actual treatment notes, Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005), these findings, which are supported by the evidentiary record, fully justified the ALJ's decision to afford little weight to Dr. Bobek's opinion.

Having discounted this treating source opinion the ALJ, however, "did not merely rubber stamp" the other medical opinions in reaching this decision. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Instead, the ALJ individually and critically assessed each of those remaining medical opinions, finding some of the opinions partially persuasive. The ALJ then fashioned a very restrictive, limited sedentary work RFC for Gorney, but nonetheless found that he could perform this limited range of work. This evaluation of the remaining medical opinions was actually very favorable to the plaintiff and afforded him the benefit of every reasonable doubt. Furthermore, these opinions and the RFC ultimately crafted by the ALJ, drew significant support from Gorney's treatment records, which suggested, at a minimum, that Gorney retained the ability to do some sedentary work. Therefore, there was nothing about this aspect of the ALJ's decision-making

35

which resulted in any unfair prejudice to Gorney which would justify a remand of this case.

We are mindful that our "'review of the ALJ's assessment of the [claimant]'s RFC is deferential,' and the 'RFC assessment will not be set aside if it is supported by substantial evidence.'" Stancavage v. Saul, 469 F. Supp. 3d 311, 339 (M.D. Pa. 2020). In the instant case, we find that the ALJ's assessment of the evidence complied with the dictates of the law and was supported by substantial evidence, a term of art which means less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565.

This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the plaintiff's argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that

applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.    <u>**Conclusion**</u>

For the foregoing reasons, IT IS ORDERED that the final decision of the Commissioner denying these claims is AFFIRMED.

An appropriate order follows.

<u>/s/ *Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: August 12, 2022